Silverman. We'll take the next case before we take a 10-minute recess. Salter v. Mitchell. Mr. Clements is here for the appellant and Mr. Brewster for the appellee. Mr. Clements, you may begin when you're ready. Let's see, who's Mr. Clements? I am, Your Honor. Ready to proceed. May it please the court, my name is Fred Clements. I represent the Conecuh County Jail defendants. This court should reverse the district court's denial of qualified immunity for two reasons. First, the jail staff was not deliberately indifferent by relying on the medical doctor's assessment of the decedent's mental health condition. Second, the law was not clearly established that jail officials could not rely on medical professionals to assess the risk and treat suicidal inmates. To my first point that the jail staff was entitled to rely, this court on multiple occasions has stated that jail officials may rely on medical professionals' decisions regarding course of treatment. Does it have to be a psychiatrist in cases of this nature? No, Your Honor. In fact... Is there any case that talks about a psychiatrist having to be called? No, Your Honor. There is no case requiring. In fact, it was the district court's opinion... There's no case that I am aware of that requires that to occur. In fact, the district court below did make that distinction of the difference between medical doctors... In Greeson v. Kemp, did that involve a psychiatrist? Yes, Your Honor. I believe that it did, but it did not hold or... I think Your Honor is moving to the clearly established prong. I usually move too quickly to the bottom line because you have so little time that I don't, you know... I understand, Your Honor. But no, Greeson did not... It's clearly established that there was a requirement that there be... To receive adequate psychiatric care, right? There are times, yes, that you would have to... It recognizes the fact that an inmate must receive adequate care. Psychiatric care? Yes, Your Honor. All right. Did this inmate receive adequate psychiatric care? Dr. West might be a fine doctor, but he's not a psychiatrist. Does that make any difference in this case, or what do we do? With the background. Yes, Your Honor. Which we all know about the background being moved from one place to another. Well, ultimately, Your Honor, of course it made a difference in the outcome. Or let's say perhaps it made a difference in the outcome. In a way where it's mere conjecture whether the involvement of this particular medical professional would have made any difference at all. And I think this is the reason why, in general, this court has applied a medical standard to cases involving jail suicide. In fact, in the city of Popham versus the city of Talladega, the case where this court first applied the deliberate indifference standard in a suicide case, this court explained that because jail suicides are analogous to failure to provide medical care, deliberate indifference is the standard. And so this court has been applying this medical standard to jail suicide cases. Isn't that an issue of fact, though, whether or not a mental health professional psychiatrist would have made a difference if he or she had been consulted in an effort to avoid a suicide by the jail inmate? Isn't that an issue of fact, whether or not that would have made a difference? Wouldn't the jury be entitled to listen to the evidence in this case and say, you know what, if they'd brought in a psychiatrist who's an expert in suicide, maybe the jail might have kept him on suicide watch and avoided the suicide. Well, to answer your question in two parts, and it's interesting that maybe the jail would have kept him on suicide watch. Suffice to say, the whether or not the mental health officers involvement would have made a difference is speculative. And in a motion for summary judgment, speculation isn't sufficient to show that that's your view, that it's speculative. Yes, Your Honor. The mental health professional might have said it would have made a difference. Well, let's look at the facts of this case. In this very case, there is evidence that the that the nurse, the jail nurse, Nurse Johnson, contacted the mental health professional for a consult. When, when, when there are also some I mean, there's evidence in this case that, first of all, all of the you know, all of these defendants, they they knew that he was suicidal. No, Your Honor. No, he was suicidal. All of these defendants knew that there was some type of suicidal history. OK, because if we take the facts in the light most favorable to Salter, they all knew that he made an effort to commit suicide two weeks before. That's not in this record. No, Your Honor. The because and it's it's a bit confusing because the the suicide effort that had taken two weeks before that actually occurred. Connecticut County deputies responded to that, but he was not brought to the jail. Jail officials did not have access to that information. And the reason that he was placed on suicide watch by the intake jailer was when when questioning him, Salter simply told him, well, I have a suicide, a history of suicide. There's something in the record here. Yes, Your Honor. At the detention center. Let's see. A nurse testified that, quote, everyone at the jail knew of that attempt. Is that not in this record? Yes, Your Honor. The jail nurse did testify to that, that everyone knew. Could you could you read the quote one more time, please? Everyone at the jail knew. That's that's taken from her mouth. Everyone at the jail knew. Now, for one, and they're speaking of the suicide attempt. Well, they were speaking in general of his proclivity for suicide. And I think to a certain extent, everyone at the jail knew that there was an issue of suicide while he was placed in suicide watch. So obviously that was enough for him to be placed in suicide watch. I'm actually more concerned because I like to look on these qualified immunity cases individually with Mitchell, Trent and Brown. Everyone, because they're relying on Dr. West's evaluation. Right. He's got a medical and mental health history. And then and he's got some psychiatric medication. He spent time, Dr. West with him. So but he's moved there from the suicide watch. He's moved to the health watch. So obviously what happened before was sufficient to be placed in suicide watch. So I'm not very concerned with that. He had problems. In fact, the doctor wanted to get Salter committed to a mental health facility. And if I understand the facts, correct. The wife, who's a plaintiff here, did not want to sign the paperwork. Right. That's correct. They were caught in a bad situation. So and then I'm he gets placed in the in the other in the health watch. What happened? Didn't something happen in health watch that should have let Mitchell, Trent, Brown or someone know he should be put back on suicide? I'm more concerned with that period of time. Well, to to answer your question regarding what individuals knew, there's no evidence in the record that either Trent or Brown were aware of the two incidences that occurred after he saw Dr. Brown. OK, so let's talk about Mitchell. He's the jail administrator, right? Yes, he's the jail administrator. Your Honor, I don't believe that there is direct evidence, but he was in the he was in the circle of communication between between the doctor and the nurse. OK, is your is your stronger argument that these people didn't know to begin with or that following the evaluation by Dr. West, they, as you said, I guess earlier, and we'll have to check the case law, we're we're entitled to rely on his medical judgment. And then the response thereafter is not deliberate, deliberately indifferent. We've been talking a lot about knowledge, but is your stronger argument the knowledge piece or the response piece? You know, the fact that they responded reasonably following Dr. West's evaluation and removal from suicide watch. I think if I'm if I am understanding your question, I think that their response after the suicide watch was appropriate. And I think as Judge Wilson was alluding to, I believe that when you take a look at what it requires to probate someone, perhaps it was an incorrect decision by the doctor. Let's assume that that decision was incorrect. Well, the doctor wanted to get him into psychiatric treatment. Oh, yes, your honor. But let's assume that the that the decision, assuming that the decision was incorrect to take him off a suicide watch. The you know, the well, after their knowledge of his suicide attempt, their response was that they failed to follow the jail's written policies. I think I need to I think I need to clarify the record. He was put on suicide watch initially by the intake jailer only because he stated he had some history of suicide. He was put on suicide watch as a precaution. And that was the extent of most of the knowledge. Why couldn't a jury determine that the failure to comply with the jail's written policies is gives rise to their deliberate indifference to his medical. Could you explain that again? Why couldn't a reasonable jury determine that their failure to comply with the jail's policies with regard to suicidal inmates was of such a nature that it constituted deliberate indifference? Well, this court has consistently held that a violation of jail policy does not equate to a constitutional violation. The United States Supreme Court and Taylor v. Barquez stated that there is no clearly established right to constitutional jail policies. And I think the more important application of Barquez to this case in the light of clearly established law. What about the evidence? I mean, they permitted him to go unmonitored for a 30 minute gap or more that he used to hang himself. I mean, they they were supposed to monitor him every 15 minutes and they just didn't. Your Honor, under the suicide watch protocol, they were to monitor every 15 minutes under the lesser heightened watch of medical watch. That was not a requirement. I thought he went 30 minutes without being checked. He may have, but that was not a requirement under the suicide watch that excuse me, the medical watch that he was placed on by the jail doctor. I guess I mean, I guess what I'm getting to is there seems to be a lot of issues of fact for the jury to decide. I think ultimately this case beyond if we go beyond the issues of fact, I think and to go back to Judge Newsom's question about what the strongest argument is. I think our strongest argument is that the law was not clearly established, that the jailers could not rely. I think we have your argument, Mr. Clements. Let's hear from Mr. Brewster. Thank you, Your Honor. First, if I could address some of your questions, I think the Supreme Court in Youngberg versus Romero has indicated that they believe that a doctor or a professional should be within their area of professional expertise. So we're going to require it for rule in your favor. Right. It's a requirement that a psychiatrist, not just a medical doctor who did all these things that Dr. West did because he did a lot. Right. Even tried to get him committed. It was there. We you need every jail has to have a psychiatrist there. I think what we're looking at is not necessarily. But what we do have to have is a level of expertise that fits the situation. I think what we're looking at here is we're putting the cart before the horse in Farmer versus Brennan. We have a subjective test and we have an objective test. The subjective test starts with is there a likelihood? Is there subjective knowledge in the defendants that they thought suicide was likely? Is it a substantial likelihood or what's the word? I believe it is a substantial likelihood. Just pretty big. Which is very big. And I believe it. And everyone admits that there was at some point that every one of the defendants had that substantial. The problem I have with this is because it's a suicide as opposed to a lot of other cases. And maybe because apparently lately there have been so many suicides and perhaps many of us have had those issues. So I'm thinking how qualified immunity applies to the officer, the captain, the people, the corrections officers who are there. And with suicides, you have individuals who seem to have happy families. Sometimes they even have good finances. And all of a sudden, because of depression, they commit suicide. And spouses and friends and coworkers don't even know about it. Or if they know about it, it's hard to prevent. Would you concede that with suicide there were instances like that, right? It can happen in history. It happens a lot, it seems like, where the family members don't even know and feel very guilty about it. And then we have qualified immunity for prison guards, basically, right? Where, what are they supposed to do? The doctor says, do this, move him from here to there. Look at him every 15 minutes, every 30 minutes. When he's in suicide watch, he has no clothes, right, except the boxer shorts. When he's in health watch, he gets claustrophobic. And the nurse says, go ahead, let a friend come in. Remember, a friend comes in. One more could the officers, the jailers do except rely on Dr. West. Except to rely on the very professional their policies mandate them to go to. Not suggestive, but mandated policies. You will, if you believe there's evidence of suicide, which there clearly was from the second he was booked in from this booking sheet, you must contact the Southwest Mental Health Professional for a face-to-face evaluation. Why didn't your wife want to commit him as Dr. West wanted to? Your Honor, I understand that that's a trial argument for the defendants. But the point of it is, we're talking about defendants who, under the Constitution and the Eighth Amendment, have an obligation to keep this man safe. Now, they may not have liked it, and they may have felt he should have been somewhere else. But while he was in their care, they had control over his life. So let me ask you this, just briefly. So your contention, I think, in your briefs and just now, is that they should have contacted therapist Brown for a face-to-face consult, right? Mr. Bryant, yes. Sorry. And Bryant's not a psychiatrist, right? He is not. So there's no argument here that there must have been a requirement, a constitutional requirement to get a psychiatrist. I agree with you, Your Honor. But the testimony from Mr. Bryant, who did testify and did say that he was not contacted for a face-to-face, he was not brought in, he did not have an evaluation, that given the facts, as the plaintiffs have stated them, he would have put him on a suicide watch, he would have taken away his clothes, he would have taken away his belt, he would have put him in a suicide-resistant cell. By the way, Your Honor, this jail did not have a suicide-resistant cell. And we must look at this as a sliding scale. Hold on. Before we get to the suicide-resistant cell, I just want to sort of make sure I've got my medical professional piece of this case squared away. Yes, sir. But, I mean, isn't your position sort of micromanaging these prison guards' decisions? So you're saying, like, no, no, no, you can't rely on a generalist, even though he has an M.D., you've got to rely on the therapist, even though he doesn't have an M.D. and can't prescribe medications. I just sort of, I mean, aren't the prison guards thinking, like, well, this guy might need medications. Maybe West, in that respect, is better than this other therapist guy. Your Honor, there is a psychiatrist available through Southwest Alabama Clinic, and he's available through the very Mr. Bryant. So the question is, I understand the doctor, who was on contract with the county, by the way, not the sheriff. He could prescribe, but he's a doctor with a limited understanding. I'm not saying he has no understanding, and I'm not saying that he wasn't trying. I'm saying that the jail—the sheriff recognized through its own mandatory policies what it was supposed to do, and it completely violated that. If Dr. West had recommended that your client be put on suicide watch, would you have expected the jailers to defer to that decision? One would have hoped so. Yes. So why not also are they allowed to defer to his decision to take him off suicide watch? If West is sort of smart enough to get him on suicide watch, and the jailers should pay attention to that, why not smart enough to take him off? West did not put him on suicide watch. No, no, no. I know. I'm just saying if. I think that we would all hope and expect that jailers would defer to a generalist MD's decision that this fellow ought to be on suicide watch. And if we agree about that, then I don't think I understand why it is that they ought not to be able to defer to his decision to take him off suicide watch. Let's step back a second. One of the problems we're facing here is I think what I was trying to get is Farmer v. Brennan has its subjective and it has its objective requirements. The subjective is the one that we've been talking about, but it's already been established. Whether there is a substantial likelihood of risk, that was already established. So now when they try to raise the doctors for the second, the object of reasonable remedy, that's what happens. And it was up to the administrator and the others to look at the reasonable remedy. Their reasonable remedy is to defer to West in everything. Carte blanche. Put him in health watch, which is different from general population where and they allowed Officer Harrelson, the shelter's friend, to visit him. They checked him out every every 15, 30 minutes, right? It's true, but it was it was clearly insufficient and it was insufficient based upon the fact. In hindsight, obviously, it was clearly insufficient. Like everyone would think in every suicide, we should have done this. We should have done that. But it's so it's so difficult for them not to have qualified immunity when someone is in health watch already. What else could they have done? I guess what we're saying. Bottom line, your honor. It's a jury question as to whether there was deliberate indifference, whether they are reasonable response under Farmer was reasonable. And I believe the court is the district court gave many reasons to establish once that there had been established that there was subjective knowledge and everyone admitted that there was, then whether the reasonable response was was one that was reasonable under Farmer. We say that reasonable response. When you say everyone admitted, who is everyone who admitted that there's a substantial likelihood that something was going to happen? Everyone knew that had mental health issues and that he was being they were making an attempt to probate him. There was attempt to make him committed. Mr. Mitchell said in testimony, I understood he was a danger to himself and to others. And your honor, listen to this. Where did you get that? I asked for Mr. Mitchell. Where did you get that information from the nurse, from the doctor and from the staff? Now, if those people who they represent are aware of that danger and letting the administrator know. Then all of them, by his own testimony, has subjective knowledge of the risk. Then the question becomes for the jury. What is the reasonable reaction as former the second requirement? What is the reasonable reaction? The district court found that a reasonable reaction are those things that are in their policies. Take away, put him in a jail resistance cell, take away his clothes, do close monitoring, none of which were done. And your honor, that's not just the policy. We're not asking you to enforce the policy. That's snow versus city of Citronelle. But so you're right. So the district court says a reasonable reaction is to do those things. Your burden on a qualified immunity case, right, is to prove that a reasonable reaction was not what they did to defer to West's judgment that he should be taken off. So that he could be taken off suicide watch and monitored through a health watch situation. And we believe that snow versus Citronelle gives us that clearly established that the clear, clear notice required under linear. Because look what happened in snow with much less evidence, but much less notice of the guy's suicidal proclivities. One, she had one risk cutting that was done sometime before. They don't even give days and information from the family that he was suicidal. This fellow, Chanel, didn't take any action to inform the other officers. And they asked Chanel, what would you have done? I would have taken away his clothes. I would have sent him back for more checkup at the University of South Alabama. I would have put him in cell resistant. And I would have put him in the drunk tank, which was supposed to be cell resistant. And your honor, I'm sorry I'm talking so fast. And, and, and, and, and close, close monitoring. And the 11th Circuit essentially, the other circuit said, yes, that is essentially acceptable, reasonable responses under farmer. Not only that, but if the other officers had known, they might have done more. They might have done, because it would have been under a, they would have used closer, closer scrutiny or something to that extent. So you have a better handle on snow than I do, I'm sure. But so in snow, you're saying that, that, that when those, when those steps were taken, the 11th Circuit said, good enough. They said those, let me first say that snow, Citronelle didn't have a policy. They had an unwritten policy. So they asked in, in the case, they asked the officer, what would you have done if you hadn't, if you had thought he was suicidal? And he listed those things. And the court articulated those things and then said specifically, if the, if the officers had known the Chanel failed to alert the other officers. If they had known, they would have not, could have not only done those, but they could have actually done more close monitoring. Chanel actually is interesting because the snow died with less, snow was being monitored less than 15 minutes apart. And yet, and yet your, the 11th Circuit said, well, that's good. But if, if the rest of the officers had taken it seriously and known about it, maybe they would have done even more close monitoring. So I think basically snow gives. Help me out here with a subjective knowledge, because I want to get to that first. Yes, sir. And I know you'll get to it real quickly. Tell me the difference between Brown, Trent and Mitchell as to what they subjectively knew. Of the suicide risk. I've got a list in here, so I'll have, I'll have to paraphrase it the best. Okay, no, that's fine. Start with the obvious one. Mitchell. Which is your, your worst case? Well, which one? I guess Trent has the least amount of knowledge. Okay, that's what I meant. That's a better way of. And Pate, the guard at the end, had all kinds of knowledge. She knew his son. And she, there was, this is a small community, Your Honor. It's a small jail, and everybody talks. So. I know. You've got to have the evidence of what they subjectively knew. Or you want to do it collectively for qualified immunity. Everybody in the jail knew. So everybody gets sued. Because whenever you see the qualified immunity cases from the Court of Appeals, they go, they go defendant by defendant. Sometimes they granted us to one and denied us to others. And, Your Honor, I'm, I'm sorry. I believe our brief lays out. Because there's a lot. It does. There is a lot. I would dare say that our case has more independent information, independent knowledge of each defendant than any case that I've read, researching for this. Maybe with the exception of that poor guy who mutilated himself 30 years ago, whatever that was, a delight. But there is an awful lot of knowledge. A lot of circumstantial, I understand. But that's allowed under, under Brenner, Brenner, Farmer versus Brennan. So we've got, we've got Pate Brown, the guard who had lots of information, heard lots of things. She admitted she knew them from the family. She knew about the previous suicide attempts. Both of them. She knew about being probated in 2009. She said there was lots of talk among the jail. So it was all discussed. Mitchell, of course, not only knew all of those things because he, in fact, had been an administrator not only when, when Brown came in and I'm sorry, when, when the disease came in in 2009, the year before, you know, which was the third, third instance had been in the jail. But he had heard about the time a guy named Mr. Rabin had committed suicide in the Connecticut County Jail in 2006. Same thing. Suicide cell. It's an identical copy, not a copycat, but it's, it's, it's a, it's a clear warning to the whole jail that this was going to happen again. So there's that knowledge. Trent, your honor, knew the least of it. I will admit a lot of her information came from being there. She was the captain on duty when the fella came into the jail. She was probably the person who put him on suicide watch because that's her job. Didn't contact anybody at mental health. And then a lot of the information she got from logs and things like that. But we'll admit that Trent has the most circumstantial of the evidence. So, and I'm sure you've covered this, but let me ask you again, if we look at snow and we say that this case is different than snow, because in this case, the defendants took affirmative steps to follow medical advice, including allowing Salter to receive medications, such as Lortab and Xanax. What's, what's wrong with that? I will say this, your honor. Snow was not there very long. Mr. Mr. Our deceased was in the jail for seven days and eight days of which there was day after day, a deterioration in his situation, all known by the officers and in particular by Mr. Mitchell on the night of his death, knowing that that you have each of the incidents on March 1st. He didn't eat on March 2nd. He had to be put in a restraint chair on March 5th. He thought he was being bit by ants on March 7th. He has some kind of other indication. All of these things would have been known by the administrator. And yet on the night of April 9th, the person who was supposed to be in charge of him was assigned a different duty in violation of the clear violation of the jail policies that there shouldn't be an officer. Miss Brown doing to do these. And in a situation where the administrator, Mr. Mitchell knew it was impossible for her to do impossible for her to do. He wasn't. The jail was short staffed. There was nobody watching him. It is luck that he was seen at all because he was fed at four o'clock. And then when they went to get his food, he was dead some 20, 30 minutes later. So the administrator, with all the knowledge that he had, knowing that he had to be, he was going to be committed and probated, knowing his whole history allowed that understaffing and him not to be monitored at all. So is it is it is it your contention that sort of we've talked a lot about knowledge, given what these these defendants knew that they should have ignored, countermanded, discounted the doctor's determination to take him off suicide watch, not stand down, but, you know, sort of, OK, we're in a different place here that they should have remained sort of DEFCON five. Your Honor, I don't discount that there is a dilemma for folks, especially lower level folks. But Howell versus Evans is a great case for putting for the exact same situation where a public officer said, you know what, we're going to contract out my brain on these decisions to medical specialists. I'm not even going to make decisions because the doctors are the best ones to know. And the 11th Circuit said very strongly, you can't do that because that becomes a policy of indifference. And when you're a small town guy in a small town jail and your life depends on being fed inside of walls and being housed inside of walls and everybody knows that you have jail have suicidal proclivities, it puts a burden on every single person. And it opens and closes that key some more than others. But every person, because they're controlling his life. And in this indication, they let that guy die because with full knowledge, with full subjective knowledge of his suicidal proclivities, they were housing him in an unsafe place and not monitoring him. All right. I think we have your argument. Thank you, Your Honor. Appreciate it. We'll hear from Mr. Clements. So, again, I would like to address Judge Wilson's question from earlier regarding questions of fact. And Your Honor is correct that there there potentially are questions of fact. But if this is a qualified if this is a clearly established law issue, there are not because it is not a question of fact that Dr. West took Mr. Salter off suicide watch. It is not a question of fact in the district court found that the jail staff relied on the doctor. It is not a question of fact that the jailers reported any odd incidences to the medical staff. And so this really comes down to, is the law clearly established that jailers cannot rely on medical professionals in mental health situations? And I question the fact about whether or not the jail's written policies regarding suicidal inmates was violated. No, Your Honor. The the because even from a practical standpoint. Well, first, I'll go back to say that there this court has commonly said that just a violation of a policy is is not sufficient to show deliberate indifference. And even though the custom that was done at the jail to go through the doctor failed, it was not in and of itself as a deliberate indifferent custom to go through the doctor to contact the medical professional to update medical so that the doctor had the most up to date information. And and so you know what the policy is to place someone in health watch versus general population, because surely you have in every jail people with mental health issues that may not rise to the level of suicidal tendencies. Is there anything in the record about that? Yes, Your Honor. And the various levels of watch vary from detention center to detention center. But I must say, well, it was created for that very purpose because someone on suicide watch at that time was in a stark cell dressed in nothing but their underwear. And you can actually take judicial notice of the weather at that time. It was between 30 and 50 degrees at that time. Yes. So you could actually want to be in health watch and still be mentally ill, right? Yes, Your Honor. But tell me the health watch. He was in a cell by himself. Yes. With clothes. With him in it. Yeah, he could have his possessions as well as a blanket, but he was kept up front where he could be monitored more closely. Is there another level in addition to general population or those are the three? To my knowledge and the only thing that was in the record, at least in the jail at that time, was health and suicide. It was a bed sheet that he used to hang himself, right? Yes, Your Honor. Okay. And so you get a bed sheet in health watch? Yes, Your Honor. Okay. And so I don't understand then why was – they were supposed to watch him, go check him out every 15 minutes, right? Not under health watch, Your Honor, no. Were they checking him out every 15 minutes except for when he hung himself? The jail staff testified that they were checking on him. In fact, his friend that was working there during the days was checking on him multiple times. Captain Trent testified that she – But when he hung himself, it's not in dispute in the record that he had not been checked for 30 minutes, right? The – I think it's closer to 17. But, you know, admittedly, we are going off of handwritten records. It's an estimation of the time that passed. Didn't the jail staff leave his cell door open for 20, 30-minute intervals to alleviate his claustrophobia? Under the doctor's orders, yes. And so it goes back to the fact that not only were they relying on the doctor, they were following his orders. Did they have the power to contact a mental health professional? Could they have? Mm-hmm. The policy did not forbid them from contacting mental health, no. But typically, under the custom, the medical staff was handling that. Okay. Did they have the authority to do that, though? Is that in this record? Under the policy, I believe that anyone could. The administrator testified that, you know, generally if someone would do that, he would do that, although it was medical that was doing that. In fact, Nurse Johnson stated that she was aware when confronted with the policy of contacting. She stated that she knew of the policy and that she contacted mental health in accordance with that policy. And to an extent, we're kind of getting into semantics here about, you know, it's a jail policy that says, you know, that some type of jail official must contact mental health. Not must, but can if you've got a suicidal inmate. Can. But we did have a jail official who contacted mental health, and that's not in dispute. Because the nurse, although she may have been employed by someone else, was working in a capacity as a nurse at that jail. And so why doesn't that fit the description of a jail official? Because aren't we just looking at pure semantics versus the spirit of what the policy was about? And I guess without respect to the policy or what the jailers in the situation could have done for qualified immunity purposes, was their law clearly warning these prison officials that they had to contact a mental health professional, that relying on the generalist wasn't good enough? No, Your Honor. Generally, there is no law that established that would require them to do so, especially given the fact that it was understood that medical was contacting mental health. All right. I think we have your argument. Court will be in recess for 10 minutes. All right.